# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ALDINA R. CAGLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:09CV40HEA/MLM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Aldina R. Cagle for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq., and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. Plaintiff filed a brief in support of the Complaint. Doc. 12. Defendant filed a brief in support of the Answer. Doc. 17. Plaintiff filed a Reply. Doc. 20. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). Doc. 4.

## I.
## PROCEDURAL HISTORY

On December 13, 2006, Plaintiff filed her applications for disability benefits, alleging an onset date of January 1, 2004. Tr. 122-23, 106-113. Plaintiff's applications were denied on February 13, 2007. Tr. 67-70. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 7, 2008. Tr. 90-100. By decision dated May 20, 2008, the ALJ found that Plaintiff was not under a disability as defined in the Act. Tr. 8-17. Plaintiff filed a request for review with the

Appeals Council, which was denied on February 4, 2009. Tr. 1-3. As such, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity ("RFC"). Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § §416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v.

Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.

2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §

404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## III.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court

must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff alleges that she is disabled due to asthma, allergic airway disease, multiple allergies, chemical intolerance, heart arrhythmia, thyroid disease, depression, anxiety, chronic dry eyes, chronic fatigue, and muscle and joint aches. The ALJ found that Plaintiff has the following severe impairments: chemical sensitivity, allergic airway disease, asthma, small atrial septal defect, and Hashimoto's thyroiditis. The ALJ further found that Plaintiff does not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. pt. 404, subpt. P, app. 1. Tr. 10, 13. Additionally, the ALJ found that Plaintiff has the residual functional capacity to perform the range of light work, except that she can lift or carry more than twenty pounds only occasionally and less weight frequently; she cannot stand or walk more than six hours in an 8-hour work day with normal breaks; she cannot climb ladders, ropes, or scaffolds; she cannot be exposed to hazards; and she cannot have more than minimal exposure to pulmonary irritants. Tr. 13. The ALJ concluded that Plaintiff's RFC does not preclude her from performing her past relevant work as an accounting clerk or office manager. Tr. 17. As such, the ALJ found that Plaintiff is not disabled.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to give proper weight to the opinions of two of her treating doctors that she is totally disabled; because the ALJ improperly evaluated Plaintiff's RFC; because the ALJ posed an incorrect hypothetical to the vocational expert ("VE"); because the ALJ improperly found that Plaintiff can perform her past relevant work; and because the ALJ failed to credit Plaintiff's testimony. In addition to the above cited alleged errors, Plaintiff contends that the "ALJ's decision should be reversed for many other reasons," without specifying what those reasons are. The court notes that Plaintiff has failed to elaborate or cite specific evidence in support of any of her arguments, other than a brief

description of the opinions of two of her treating doctors who opined that she is totally disabled. Nonetheless, in the interests of justice, the court will address Plaintiff's generalized contentions.

## A.      Plaintiff's credibility:

As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ.  Guillams V. Barnhart, 393 F.3d 798, 801(8th Cir. 2005); Hutsell, 892 F.2d at 750;  Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d273, 275 (8th Cir. 1995).  Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996).  In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination."  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).  See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  For the

following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, as required by the Regulations and case law, the ALJ considered Plaintiff's medical records[1] as well as her testimony and concluded that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. In particular, the ALJ considered that the medical evidence does not support Plaintiff's assertion that she has a medically determinable arrhythmia or that her atrial septal defect resulted in any serious limitation. Tr. 14-15. The ALJ also considered diagnostic test results and that they did not show abnormalities which could reasonably be expected to produce symptoms of the disabling frequency, severity, and duration asserted by Plaintiff. The ALJ further considered that chest x-rays of Plaintiff's lungs were unremarkable with no evidence of pulmonary disease; that diagnostic cardiac testing has shown normal aortic and mitral valves, normal ejection fraction, and no evidence of coronary artery disease; and that physical examinations indicated regular heart rate and rhythm with systolic ejection murmur. Tr. 15. The ALJ also considered that there was no objective evidence of muscle atrophy, spasm, or weakness, bowel or bladder dysfunction, neurological deficits, or inflammatory signs. Indeed, test results showed that Plaintiff's cardiopulmonary function was largely normal; that there were no acute infiltrates or infusion; that Plaintiff's heart size and chest were normal; and that Plaintiff's septal defect was minimal. Tr. 263, 271, 438, 443, 504, 556-61, 708. Further, examination showed no edema, normal gait, and that Plaintiff was oriented. Tr. 229, 243. The absence of objective medical evidence to support a claimant's subjective complaints is a factor to be considered by an ALJ upon evaluating the claimant's credibility. See Russel v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991). As such, the court finds that the ALJ properly considered the absence of objective medical evidence to

---

[1]        The ALJ's consideration of Plaintiff's medical records are discussed, in detail, below.

support Plaintiff's allegations and that the ALJ's decision in this regard is supported by substantial evidence.

Second, the ALJ considered Plaintiff's daily activities. Plaintiff testified that she is able to bathe herself, prepare simple meals, do laundry, wash dishes, and use the computer. She also testified that she eats at restaurants at least once a week; that she does not do much reading; that she spends most of the morning watching television; that her husband does the grocery shopping; that once a month Plaintiff may go with her husband to the grocery store; that she puts dishes in the dishwasher; and that she has no problem taking a shower. Tr. 36-39. While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second

step of analysis). An ALJ, however, is not required to believe all of a claimant's assertions concerning her daily activities. Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996). "[S]ubjective complaints of pain cannot be disregarded solely because there is no supporting medical evidence, but they can be discounted if the ALJ finds inconsistencies in the record as a whole." Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (citing Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997)). As such, the court finds that the ALJ's consideration of Plaintiff's daily activities is based on substantial evidence and that it is consistent with the Regulations and case law.

Third, the ALJ considered that Plaintiff's daily naps were not taken upon medical advice which is reflected in the record. Plaintiff testified that when she is in pain she takes a two and a half hour nap to alleviate the pain. Plaintiff also testified that she takes a nap from 2:00 to 4:00 p.m. A claimant's limitation which is self-imposed rather than a medical necessity is a basis upon which an ALJ may discredit a claimant's alleged limitation. See Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether [the claimant] was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition compels him to nap each afternoon."); Brunston v. Shalala, 945 F. Supp. 198, 202 (W.D. Mo. 1996 ("Plaintiff also testified that she spent part of the day lying down; however, no physician stated that such a need existed. If plaintiff was not lying down out of medical necessity, then that indicates that she was lying down by choice."). A record, such as that in the matter under consideration, which does not reflect physician imposed restrictions suggests that a claimant's restrictions in daily activities are self-imposed rather than by medical necessity. See Zeiler, 384 F.3d at 936 ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot

or lie down daily."). Further, where there is a lack of documentation regarding a claimant's allegation that she needs to take daily naps, an ALJ may conclude that the claimant chose to nap. See Schroeder v. Sullivan, 796 F. Supp. 1265, 1270 (W.D. Mo. 1992) (holding that the claimant's need to take naps was not documented in the record and because the claimant failed to complain to his doctors about drowsiness, "contradict[ed] his assertion that he must nap during the day"; "It is as likely that Plaintiff chooses to nap at times he might otherwise choose to remain awake."). As such, the court finds that the ALJ's consideration that Plaintiff's naps are not taken on medical advice is based on substantial evidence and that it is consistent with the case law and Regulations.

Fourth, the ALJ considered that Plaintiff's thyroid condition was controlled by medication and that the effects of her chemical sensitivity and asthma would be negated through work in a clean air environment. Tr. 15. Plaintiff testified that she takes two antidepressants; that they help with her depression; and that since she has been on this medication she no longer cries. Plaintiff also testified that her allergy medication, in conjunction with avoidance of triggers, such as certain food and cleaners, alleviates some symptoms. Tr. 43-46, 59. Further, Dr. Sultan reported on October 5, 2006, that treatment improved Plaintiff's thyroid condition and had lessened her fatigue; that her hair was not falling out as much as it previously had been, "which could be partially from treatment of hypothyroidism" with Armour Thyroid; and that her vaginal yeast infection was not as bad upon her taking Diflucan. Tr. 310. Conditions which can be controlled by treatment are not disabling. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. Additionally, the absence of side effects from medication is a proper factor for the ALJ

to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication."); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). The court finds, therefore, that the ALJ properly considered that Plaintiff's medications help, and further finds that substantial evidence supports the ALJ's conclusion in this regard.

Fifth, the ALJ considered that Plaintiff had conservative treatment in that she used over-the-counter medication and magnesium and potassium supplements. Plaintiff testified that she takes those supplements as well as Tylenol. Tr. 52. As considered by the ALJ, Plaintiff has never had in-patient hospital treatment for asthma exacerbation or respiratory distress. Moreover, she has never been hospitalized for depression. See Benskin, 830 F.2d at 884 (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); Cruse v. Bowen, 867 F.2d 1183, 1187 (8th Cir. 1989) (holding that minimal consumption of pain medication reveals a lack of disabling pain); Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain). The court finds that the ALJ's considering that Plaintiff had conservative treatment and takes over-the-counter medication is based on substantial evidence and that it is consistent with the Regulations and case law.

Sixth, the ALJ considered that, at the hearing, Plaintiff did not appear to be in any credible physical or mental discomfort at the hearing, despite Plaintiff's assertion that she was "always" dizzy, short of breath "all the time," and could not leave the house without having a panic attack. While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th

Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"); <u>Jones v. Callahan</u>, 122 F.3d 1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints as incredible."). Here, to reach his conclusion, the ALJ combined his review of the record as a whole with his personal observations. As such, the court finds that the ALJ properly considered his observations and that his determination in this regard is based on substantial evidence on the record.

Seventh, the court notes that there is a lack of correlation between Plaintiff's alleged onset date and the onset of her symptoms. Plaintiff did not stop working until 2004, although there is evidence that, since 1999, Plaintiff had sinus, allergy, and breathing problems. Moreover, a letter written by Plaintiff in September 2004, to Dr. Davis, reflects that Plaintiff did not intend to stop working permanently; rather, she intended to take advantage of short and long-term disability benefits as well as workers' compensation.[2] Tr. 288. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." <u>Johnson</u>, 240 F.3d at 148-49.

_____

[2]      In this letter dated September 30, 2004, to Dr. Davis, Plaintiff stated that "[b]efore [her] 13 weeks of in house disability ran out, a few days before I sent to work a Report of Injury form for Worker's Compensation, I mailed it certified with return receipt"; and that her employer concluded that since Dr. Davis's "disability letter stated that [she] should cease employment with Poplar Bluff Tool & Die due to [her] Asthma and the occupational exposures at [her] work environment, that I must of decided to follow [Dr. Davis's] advice and quit." Plaintiff further stated in this letter that she "needed to leave work due to [her] health, but only on a disability leave so [she] would be protected and entitled to all of [her] employee benefits." Plaintiff requested that Dr. Davis write a "follow-up letter" to protect herself and to be prepared "for what ever that may come out of the EEOC investigation," as she intended to file a complaint with the EEOC. She asked that his letter state that Dr. Davis did not advise Plaintiff to quit her job, "especially after [she] told [him] of the employee benefits that [she] was entitled to and that [she] would get paid for 13 weeks in house and then the possibility of either going long term disability after that or even Worker's Compensation." Tr. 288.

"Working generally demonstrates an ability to perform a substantial gainful activity." <u>Goff</u>, 421 F.3d at 792 (citing <u>Nabor v. Shalala</u>, 22 F.3d 186, 188-89 (8th Cir. 1994)). 20 C.F.R. § 404.1574(a) provides that if a claimant has worked, the Commissioner should take this into consideration when determining if the claimant is able to engage in substantial gainful activity. Moreover, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. <u>See</u> <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990). Further, working after the onset of an impairment is evidence of an ability to work. <u>Goff</u>, 421 F.3d. at 793; <u>Goswell v. Apfel</u>, 242 F.3d 793, 798 (8th Cir. 2001). Section 404.1574(a)(1) further states that work which a claimant is forced to stop or reduce below the substantial gainful activity level after a short time because of his impairment is generally considered an unsuccessful work attempt.

For the reasons fully set out above, the court finds that the ALJ's consideration of Plaintiff's credibility is based on substantial evidence and that it is consistent with the Regulations and case law.

**B.      Opinions of Plaintiff's Treating Physicians:**

Plaintiff contends that the ALJ did not give proper weight to the opinions of Tipu Sultan, M.D., a specialist in environmental medical issues, including chemical sensitivity, and the opinion of Andrew Fiore, M.D. Both of these doctors were Plaintiff's treating doctors and opined that she is totally disabled and unable to work. The only argument Plaintiff made in this regard is that Dr. Sultan concluded, after "exhaustive testing," that Plaintiff suffers "multiple chemical sensitivity." In regard to Dr. Fiore, Plaintiff contends that the ALJ dismissed his opinion regarding Plaintiff's disability.

First, to the extent that the ALJ did not address specifically every document in Plaintiff's voluminous medical records, it does not mean that the ALJ did not consider all of Plaintiff's records. <u>See</u> <u>Wheeler v. Apfel</u>, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing <u>Black v. Apfel</u>, 143 F.3d 383,

386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"); Moore ex rel. Moore v. Barnhart, 413 F.3d718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).

Further, "it is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). See also Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006) (citing Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005)). The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be

supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 9937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). A treating physician's checkmarks on a form, however, are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996).

Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record).

"Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlin, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Hogan, 239 F.3d at 961.

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").

An ALJ may discount or disregard the opinion of a treating doctor if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Prosch, 201 F.3d at 1012-13. "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Hogan, 239 F.3d at 961. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence) (citing Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005)). See also Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a doctor's opinion stated in a checklist

should not have been given controlling weight because the doctor had met with the plaintiff only three times at the time he completed the form).

Upon determining that Plaintiff is not disabled, the ALJ considered Plaintiff's medical records and the opinions of treating and consulting doctors. The court notes that Douglas L. Davis, M.D., who was Plaintiff's treating doctor, reported in January 2004, the month in which Plaintiff contends she became disabled, that Plaintiff's heart had regular rhythm and no murmurs; that her lungs were "CTA," that she was well developed and in no acute distress; that her neck was supple; that she had no edema in her feet; that she had normal gait; and that she was oriented times three. Tr. 243. Also, a January 30, 2004 Diagnostic Imaging Report, ordered by Dr. Davis, states that the indication for the test was "cough"; that the finding was that there was "no acute infilrates or infusion" and the heart was normal size; and that the impression was "no evidence of acute cardiopulmonary process." Tr. 263. A Diagnostic Imaging Report states that a CT scan of the chest performed on February 23, 2004, showed no acute infiltrates or effusion, calcifications in the lungs from old granulomatous disease, and no soft tissue pulmonary lesions and that the heart was within normal limits in size. Tr. 504. On March 19, 2004, Dr. Davis reported that Plaintiff had been referred to him for "question of occupational lung disease"; that she worked at a welding plant; that Plaintiff stated that on days that welding occurred she has symptoms of nasal congestion and malaise, "but no shortness of breath"; and that Plaintiff said she had pain in her wrist joints, that a rash occurs on her forearm and chest wall, and that she had incidents of swelling in her lymph nodes underneath her chin and in her neck. Also, on this date Dr. Davis prescribed "a trial of steroids" and diagnosed Plaintiff with sarcoidosis,[3] " especially with a history of swollen lymph nodes underneath the chin and on the neck," "symptoms

---

[3] Sarcoidosis is a chronic, progressive, systemic granulomatous reticulosis of unknown etiology, involving almost any organ or tissue, including the lungs. Dorland's Illustrated Medical Dictionary, 716 (28th ed. 1994) ("Dorland's").

of night sweats with no weight loss," and feeling of "generalized malaise," and reported that "a CAT scan [was] consistent with old granulomas." Tr. 303-305.

Plaintiff saw Mary Ellen Kleinhenz, M.D., on April 22, 2004. Records of this date reflect that Dr. Kleinhenz diagnosed Plaintiff with probable sarcoidosis and possible allergic airway disease. Dr. Kleinhenz stated that she was ordering a CT of the chest. Tr. 301. The ALJ considered that April 30, 2004 pulmonary function studies indicated normal test results. Tr. 11. Indeed, records reflect that an April 30, 2004 pulmonary function test performed upon Dr. Kleinhenz's order showed that "lung volumes by body plethysmography [was] within *normal limits*"; that spirometry showed *normal ratios*; that airway resistance was *normal*; that "arterial blood gas showed *normal level* of acid base balance with normal ventilation and oxygenation"; and that the impression was a *normal pulmonary function test*. Tr. 438.

On May 20, 2004, Dr. Kleinhenz reported that Plaintiff "may have allergic airways disease and/or bronchiectasis as a complication for pronounced environmental exposures"; that Plaintiff was "introduced to Conbivent as a rescue inhaler"; and that Plaintiff "pressed" this doctor "quite strongly to write a note indicating that she had asthma in hopes that her employer would clean the workplace." Tr. 440-41. A CAT scan performed on May 20, 2004, upon Dr. Kleinhenz's order, showed that Plaintiff's *chest was normal*; that *the lungs were well aerated and free of infilrates, mass, and nodule*; and that *no bronchiectasis or peribronchial thickening* was seen. Tr. 443.

In regard to Dr. Davis's records, the ALJ considered that Dr. Davis was Plaintiff's treating doctor and that on June 4, 2004, he diagnosed Plaintiff with asthma and a thyroid nodule. The court notes that a nuclear medicine report dated June 9, 2004, states that a thyroid scan showed that the right lobe was larger than the left. Tr. 254. On September 24, 2004, Dr. Davis completed a Disability Claim Form for Plaintiff stating that she should avoid exposure to things that exacerbate her asthma;

that she should not work in an environment which causes her condition to worsen; and that the date Plaintiff could return to work full time was unknown. Tr. 280.

Records reflect that Plaintiff was seen by Muhannad Al-Kilani, M.D., of Missouri Delta Endrocrinology & Diabetes Center, on October 7, 2004. Dr. Al-Kilani reported on this date that Plaintiff had a small thyroid nodularity and positive thyroid antibodies; that upon examination Plaintiff was in no acute distress, she was conscious and oriented, and *moved all limbs symmetrically*; that the assessment was that Plaintiff had Hashimoto's thyroiditis; and that Synthroid was prescribed. Tr. 480.

Dr. Davis reported in February 2005 that Plaintiff had asthma and multiple chemical sensitivity and that she should avoid exposure to things that exacerbated her asthma and which caused her condition to worsen.

A physical therapy, initial evaluation report, dated February 15, 2005, states that Plaintiff had no weight bearing restrictions; that she was alert and oriented; that Plaintiff had been diagnosed with allergic airway disease; that she had been out of work since June 2004; and that Dr. Davis had ordered physical therapy to test Plaintiff's physical abilities for long-term disability rating. The physical therapist reported that Plaintiff "should be able to *lift/carry 1-10 pounds continuously, lift/carry 11-20 pounds frequently, lift/carry 21-50 pounds occasionally*, and greater than 50 pounds never"; and that Plaintiff "*should be able to frequently bend and reach above shoulder height" and to "occasionally knee, crawl, climb stairs, and push and pull.*" Tr. 272-73.

Dr. Davis reported in March 2005 that Plaintiff was well-developed, appropriated groomed, and in no acute distress; that in regard to her heart, she had no murmurs; that she had *normal gait*; and that she was *oriented* times three. Tr. 229.

The ALJ considered that Dr. Sultan was Plaintiff's treating allergist and that he treated Plaintiff since April 2005 for diagnosed chemical sensitivity resulting from exposure to toxic chemicals at work. Tr. 10. In his notes from Plaintiff's first visit on April 19, 2005, Dr. Sultan wrote, in regard to Plaintiff's occupation, that she "is disabled right now previously she worked for tool & die company." Dr. Sultan's notes of April 19, 2005 further list Plaintiff's diagnosis to include: chemical sensitivity, allergic rhinitis, chronic sinusitis, hay fever, serous otitis media, recurrent canker sores, recurrent otitis media, and candidiasis, including vaginal yeast infections, irritability, anxiety, constipation, reduction in memory, confusion, insomnia. Dr. Sultan's assessment of April 19, 2005, was that Plaintiff had seen numerous doctors and had been prescribed numerous medications, and that "it [was] clear from history and physical findings that the prior treatment plan failed and prior diagnosis was not accurate. ... [I]t is necessary for [Plaintiff] to undergo laboratory test, allergy testing, and possibly allergy immunotherapy. This is in addition to a regimen of supplemental medications." Tr. 580-82.

The ALJ considered emergency room records of July 15, 2005, which reflected that Plaintiff presented on that date with complaints of "environmental illness" due to respiratory exposure to chemicals with symptoms of chest tightness; that Plaintiff reported subjective feelings of dyspnea; that she reported taking no medications for the prior two weeks; that chest *x-rays showed normal chest with no acute process to account for Plaintiff's symptoms*; and that Plaintiff was diagnosed with Hashimoto's thyroiditis and asthma, treated with nebulized Albuteral. Tr. 10-11. Records further reflect that when Plaintiff presented in the emergency room on July 15, 2005, she was diagnosed with bronchitis. Tr. 556-61.

The ALJ further considered that Plaintiff sought emergency room treatment on September 14, 2005, for complaints of chest tightness, and shortness of breath, and that, on this date, she was

diagnosed with thyrotoxicosis and adverse drug reaction. Tr. 11. Notes of this date further reflect that Plaintiff's lungs were clear to auscultation; that Plaintiff had *normal range of joint motion and muscle strength in all four extremities*; that Plaintiff was *oriented* times three; that Plaintiff had stopped taking Lexapro; that an EKG was normal; and that the emergency room doctor believed Plaintiff's symptoms were thyroid-related. Tr. 566, 577.

In a letter dated October 11, 2005, to Plaintiff's attorney, Dr. Sultan wrote that he had come to the conclusion that Plaintiff's "prolonged work at place of work is a proximate cause for most of her illness especially chemical sensitivity"; that her "respiratory allergies in the form of allergic rhinitis, chronic sinusitis, and bronchial asthma are the result of [Plaintiff's] prolonged working at her place of employment"; and that Plaintiff would need additional evaluation in the form of chemical testing and various blood tests. Tr. 309.

In a letter dated October 31, 2005, to "whom it may concern," Dr. Sultan wrote that Plaintiff had been under his care since April 19, 2005; that she has a problem with severe chemical sensitivity; and that in his opinion "she is totally disabled and is unable to work at all." Dr. Sultan further wrote that he estimated that Plaintiff's "disability would last at last six months if not longer." Tr. 579.

Dr. Sultan's records of June 22, 2006, state that Plaintiff said that her symptoms had "not much improved"; that she "can't even go outside without getting sore throat and asthma attack"; and that she was "tired & depressed all the time." Tr. 319. Dr. Sultan's records of June 26, 2006, state that Plaintiff's thyroid had been increased to "2 grains"; that "at this level her energy [was] much better than what [it] was at one grain"; and that there were no symptoms of excess dose of thyroid; that Plaintiff stated that "although her energy is better [ ] if she does some physical exertion her muscles would get quite fatigued and she would have a lot of muscle aches and pains." Tr. 317.

Dr. Sultan's notes of October 5, 2006, state that Plaintiff said that "[b]eing away from chemicals she states that if she stays home she has better day and has some improvement in her energy level and instead of napping like 3 hours she may nap 2 hours." Notes of this date also state that "[o]n review of her symptoms [Plaintiff] states that her chronic simus infections have improved a lot"; that her "recurrent canker sores [were] better"; that "since [she] has been away she did not have any ear infection"; that her Hashimoto's thyroiditis was better "in which she meant was that her fatigue [was better which is partially contributable to treatment for hypothyroidism"; that her stuffy nose was better "as long as she is at home"; that she still had a problem with tightness of the chest and shortness of breath on exertion; that her constipation and diarrhea was better; that her premenstrual symptoms were not better except premenstrual breast engorgement; and that she still had numerous problems, including gas, depression, headaches, anxiety, aggressiveness, reduction in memory, hyperactivity, feeling sick all over, personality changes, difficulty setting goals, and an inability to cope with daily stresses. Also on October 5, 2006, Dr. Sultan reported, *pursuant to physical examination*, that Plaintiff had *normal development, was well nourished, and in no acute distress*; that she was *alert and oriented* times three; that her neck had no masses or carotid bruit; that, in regard to her cardiovascular system, Plaintiff had "RRR, no murmur, gallops, rubs"; and that, in regard to lymph nodes, she had no adenopathy in her neck. Tr. 310, 312.

On July 16, 2006, Jeffrey Gfeller, Ph.D., conducted a neurological evaluation of Plaintiff pursuant to a referral from Plaintiff's attorney. Dr. Gfeller reported that Plaintiff was accurately oriented to person, place and time; that Plaintiff's overall memory function was at the bottom of the average range; that Plaintiff's language and comprehension for simple and complex statements was intact; that her expressive speech was intact, "although she occasionally lost her train of thought during the interview"; that Plaintiff's reading recognition skills fell in the average range; that

Plaintiff's arithmetic skills were average; that when Plaintiff's motor abilities were tested, she demonstrated average performance with the right, dominant, hand and "slightly below average" with the non-dominant left hand; that on the Grooved Pegboard Test, which measures fine motor speed and dexterity, Plaintiff exhibited average performance with the right hand and below average with the left hand; that none of Plaintiff's "scores on the motor tests were low enough to be indicative of significant neuropsychological impairment"; that in regard to a test which measured constructional skills, Plaintiff's performance fell within the average range and was not indicative of significant neuropsychological impairment; and that it was "difficult to account for the discrepancy between [Plaintiff's] subjective report of cognitive difficulties and the lack of objective indications of neuropsychological impairment during the current testing." Tr. 629-36.

Jeanne M. Thompson, M.D., conducted a consultive psychological evaluation of Plaintiff on January 18, 2007. Dr. Thompson reported that Plaintiff was alert and oriented; that there was no evidence of perceptual abnormalities; that her thoughts were lucid, relevant, and well organized; that her immediate, recent, and remote memory were intact; that her insight into her illness and judgment for social situations was intact; that Plaintiff was capable of abstract thinking; that she was depressed in mood and manner; that Plaintiff had a GAF of 60[4]; and that in the past year Plaintiff had a GAF of 70. Tr. 675-77.

---

[4]    Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

The ALJ considered that in February 2007 Dr. Sultan opined that Plaintiff was disabled. Tr. 10. In a February 6, 2007 letter to Plaintiff's lawyer, Dr. Sultan listed Plaintiff's symptoms, including chemicals bothering her since 2000-2001, chronic sinus infections since 2000, depression and anxiety since 2003, shortness of breath since February 2000, yeast infections for three years, shortness of breath since February 2000, night sweats since 2003, swollen lymph nodes since June 2004, hair falling out since November 2003, and teeth chipping and breaking for four years. Dr. Sultan further stated in the February 6, 2007 letter that Plaintiff's history "reveals that there are a lot of environmental exposures at work which consist of exposure to excessive amount of mold from water leak in her office and a lot of chemical odors that would come into her work area because the heating air conditioning was shared between her and the shop." Dr. Sultan further stated that Plaintiff's exposure to substances at work, many of which are toxic chemicals, "has resulted in her sensitivity to not only those toxic chemicals but also other chemicals that are encountered in day-to-day life." Dr. Sultan stated that in his opinion, Plaintiff is "totally disabled and cannot be employed in any near seeable future - not in years." Tr. 791-92.

Pursuant to a request from Dr. Davis, Dennis Daniels, M.D., conducted a pulmonary consultive evaluation of Plaintiff on September 12, 2007. Dr. Daniels diagnosed Plaintiff with a heart murmur. Tr. 726.

The ALJ considered that Stanley Ziomek, M.D., a cardiologist, treated Plaintiff in November 2007 for shortness of breath with exertion; that an echocardiogram showed atrial septal aneurysm with leakage; that diagnostic test results showed aneurismal changes in the intraatrial septum with normal aortic and mitral valves, normal ejection fraction, and no evidence of coronary artery disease; that Plaintiff diagnosed with *small atrial septal defect*; that Dr. Ziomek reported that **this** *did not represent a significant finding*; that *no further treatment was recommended*; and that physical

examination showed that Plaintiff's lungs were clear with no wheezing and regular heart rate and rhythm. Tr. 11. Indeed, Dr. Ziomek reported on November 30, 2007, that Plaintiff had a small atrial septal defect or patent foramen ovale; that Plaintiff was a candidate to have the atrial septum explored and any defect repaired; and that surgery was scheduled for December 20, 2007. Tr. 700.

Records reflect that Plaintiff had a left heart catheterization on November 14, 2007; that there were no complications from this procedure; and that the impression was that Plaintiff had a "flow murmur." Tr. 704-705.

On December 26, 2007, Dr. Daniels reported that Plaintiff's lungs were clear; that she had a "soft 1/6 ejection murmur"; that, in regard to her extremities, she had no clubbing, cyanosis, or edema; that she had normal gait; that Dr. Daniels told Plaintiff to stop her medications; that a diagnostic polysonogram showed that Plaintiff "only had a respiratory disturbance index of 2 events per hour with an SPO2 nadir of 91"; that this test also showed that Plaintiff had "mild periodic limb movement disorder with 5 events per hour." Tr. 718-19.

The ALJ considered that on February 19, 2008, Dr. Daniels reported that upon physical examination Plaintiff's lungs were clear; that Plaintiff had regular heart rate and rhythm with a systolic ejection murmur; that Plaintiff was diagnosed with minimal luminal irregularity which was non-critical; and that it was recommended that Plaintiff exercise and have a low fat diet. Tr. 11. The court notes that Dr. Daniels also reported in a February 19, 2008 letter to another doctor that "all of [Plaintiff's] symptoms come down to anxiety, shortness of breath from cardiogenic disease"; that Plaintiff's "concerns about having this repaired are understandable"; that Dr. Daniels told Plaintiff that she should focus on obtaining insurance or contact government agencies that could provide her with insurance or to help her get the surgery she needs to cure her heart"; that Dr. Daniels counseled Plaintiff that the "'nonobstructive coronary artery disease' meant that she only had *minimal luminal*

28

*irregularity"* and that "this was *noncritical narrowing of the arteries* and that she *should continue to live her life with exercise and low fat diet* as tolerated." Tr. 714-16.

The ALJ considered that Dr. Fiore, who is a cardiologist, reported on March 31, 2008, that Plaintiff had atrial septal defect imposing symptoms of shortness of breath that prevented her from sustaining a normal work schedule until she underwent non-surgical closure. Tr. 11. In his letter of March 31, 2008, Dr. Fiore further stated that Plaintiff is "relatively disabled from [her] condition"; that Plaintiff has significant shortness of breath and "at times her functional capacity is highly incapacitated"; that it would be difficult for Plaintiff "to carry out a 40 hour a week job in her current medical condition"; that Plaintiff's "disability very likely could be reversed upon closing [the] hole within the upper chambers of her heart"; that the "closure does not require surgery"; that the closure can be performed in the cardiac catheterization laboratory using an atrial septal defect closure device; and that the risk of this procedure is "extremely low." Tr. 793.

The ALJ considered that in April 2008 Dr. Sultan opined that Plaintiff is disabled. Tr. 10. In an April 2, 2008, questionnaire, Dr. Sultan stated that Plaintiff's major diagnosis is chemical sensitivity and that, in his opinion, Plaintiff had "been markedly injured at work from chemicals and other exposures and she is totally disabled and her chances of recovery to get employed in a gainful manner is very unlikely." Tr. 794.

After considering Plaintiff's medical records, the ALJ found that Dr. Sultan's statement that Plaintiff is disabled is entitled to little weight. In this regard, the ALJ noted that a statement that a claimant is disabled is not a medical opinion; rather, it is an administrative finding which requires familiarity with the Regulations and legal standards. Tr. 16. A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v.

Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment); Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence).

Next, consistent with the Regulations and case law, the ALJ noted that absent exposure to chemicals and pulmonary irritants, Dr. Sultan did not indicate any other limitations on Plaintiff and that, therefore, a finding of disability is inconsistent with Dr. Sultan's own medical treatment records and the conservative treatment rendered. See Prosch, 201 F.3d at 1013; Cox, 471 F.3d at 907. Indeed, Dr. Sultan reported in June 2006 that Plaintiff's chronic sinus infections had improved; that her Hashimoto's thyroiditis was better; that Plaintiff had less fatigue; that her stuffy nose was better; and that Plaintiff was well nourished, in no acute distress, and oriented. As such, substantial evidence on the record supports the ALJ's finding in regard to Dr. Sultan's records.

The ALJ chose to give greater weight to the opinions of Dr. Ziomek and Dr. Daniels, who indicated that Plaintiff's diagnosed atrial septal defect did not represent a severe impairment, than to

the opinion of Dr. Fiore, who opined that this impairment imposed disabling symptoms. Indeed, Dr. Daniels and Dr. Ziomek were also Plaintiff's treating physicians. The ALJ further opined that Plaintiff's RFC was greater than that opined by Dr. Fiore but more limited than that opined by Dr. Ziomek and Dr. Daniels. As such, consistent with the Regulations and case law, the ALJ considered the record as a whole and resolved conflicts between the opinions of doctors of record. See Estes, 275 F.3d at 725; Hogan, 239 F.3d at 961; Wilson, 172 F.3d at 542; Tindell, 444 F.3d at 1004.

Upon giving controlling weight to the opinion of Dr. Zoffuto, a medical consultant, who determined that Plaintiff can perform no more than light exertional work activity with non-exertional postural and environmental limitations, consistent with the Regulations and case law, the ALJ considered that the opinion of such a person must be considered and weighed as those of a qualified physician who is an expert in the evaluation of the medical issues in disability claims under the Act. The ALJ found that the opinion of Dr. Zoffuto is supported by and is consistent with the objective medical evidence. Tr. 16. Indeed, the report of a non-treating medical source may be sufficient to support an ALJ's findings "where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). "'It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment.'" Id. at 939 (quoting Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir.2004)). "The regulations specifically provide that the opinions of non-treating physicians may be considered. 20 C.F.R. §404.1527(f)." Id. As such, the court finds that the ALJ properly relied on the opinion of Dr. Zoffuto and that his decision in this regard is supported by substantial evidence.

In conclusion, the court finds that the ALJ's decision, in regard to the weight given to the various treating and consulting doctors of record is based on substantial evidence and that it is consistent with the Regulations and case law.

## C.    Plaintiff's RFC:

As stated above, Plaintiff argued, without explanation, that the ALJ erred in regard to determining her RFC.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Anderson v. Shalala, 51 F.3d 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th

Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step 5 "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level.

Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id. In any case, "[a] disability claimant has the burden to establish her RFC."

Eichelberger, 390 F.3d at 591 (citing Masterson, 363 F.3d at 737).

As discussed above, prior to determining Plaintiff's RFC, consistent with the Regulations and case law, the ALJ considered her extensive medical records, including the opinions of treating and consulting doctors, as well as Plaintiff's testimony. See Eichelberger, 390 F.3d at 591; Tucker, 363 F.3d at 783; Lauer, 245 F.3d at 704; Anderson, 51 F.3d at 779.

Further, as required by the Regulations and case law, upon making his RFC assessment, the ALJ first identified Plaintiff's functional limitations and restrictions and then assessed her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737; Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004). Pursuant to this requirement, the ALJ found that Plaintiff's subjective complaints were not credible and further found that she can engage in the full range of light work[5] with the following functional limitations: she can lift no more than 20 pounds occasionally and less weight frequently; she can not stand or walk more than 6 hours in an 8-hour workday with normal breaks; and she cannot climb ladders, ropes, or scaffolds. Additionally, the ALJ found that Plaintiff is restricted in regard to avoidance of exposure to hazards and no more than minimal exposure to pulmonary irritants. Tr. 13.

_____

[5] The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251,*6 (SSA).

The court finds that the ALJ's conclusion that Plaintiff can engage in light work, with the stated environmental restriction, is consistent with his findings regarding the medical evidence and Plaintiff's credibility and that it is based on substantial evidence on the record. Moreover, the ALJ's determination of Plaintiff's RFC is precise as it directly addresses her restrictions and the requirements of light work. Additionally, the ALJ's assessment of Plaintiff's RFC is based upon and is consistent with all of the relevant evidence. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995). As such, the court finds that the ALJ's determination of Plaintiff's RFC is based on substantial evidence and that it is consistent with the Regulations and case law.

**D.    The Hypothetical to the Vocational Expert, and Plaintiff's Past Relevant Work:**

As stated above, Plaintiff argued, without explanation, that the ALJ erred in regard the hypothetical which he posed to the vocational expert ("VE"), and in regard to his determination that Plaintiff can perform her past relevant work.

If a claimant is found to have non-exertional impairments[6] that diminish the claimant's capacity to perform the full range of jobs listed in the Medical-Vocational Guidelines, the Commissioner must solicit testimony from a VE to establish that there are jobs in the national

---

[6]    SSR 83-10, 1983 WL 31251, at *6, defines a non-exertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, further defines non-exertional limitation as  "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

economy that the claimant can perform. Robinson, 956 F.2d at 839. Consistent with this requirement, after determining that Plaintiff has environmental restrictions, the ALJ solicited the testimony of a VE.

Additionally, 20 C.F.R. § 404.1560 states in relevant part in regard to a claimant's ability to perform past relevant work:

(b) Past relevant work ...

(2) Determining whether you can do your past relevant work. We will ask you for information about work you have done in the past. We may also ask other people who know about your work. (See § 404.1565(b).) We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

(3) If you can do your past relevant work. If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy. ...

Additionally, an ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir.

1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobana, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

Even though a VE does not specifically recite factors in his answers, an ALJ can properly assume that the vocational expert "framed his answers based on the factors the ALJ told him to take into account." Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir. 1991). Where an ALJ's hypotheticals included all of a claimant's impairments as supported by the record, and the expert limited his opinion in this regard, an ALJ properly relies on the vocational expert's testimony. Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995).

The court has found above that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence. As required by the Regulations and case law, after determining Plaintiff's RFC, as set forth above, the ALJ posed a hypothetical to a VE which included the limitations which the ALJ found credible. See Gilbert, 175 F.3d at 604; Haggard, 175 F.3d at 595; Sobania, 879 F.2d at 445; Rautio, 862 F.2d at 180. As such, the court finds that the hypothetical which the ALJ posed to the VE was proper and that it is supported by substantial evidence on the record.

The VE testified that Plaintiff's past relevant work as an accounting clerk is a skilled, sedentary exertional level occupation; that Plaintiff testified that she performed this job at the light

exertional level; that Plaintiff also has past relevant work as an office manager, which is a skilled sedentary exertional level occupation; and that Plaintiff testified that she performed this job at the medium exertional level. The VE then testified that the person described in the ALJ's hypothetical could perform Plaintiff's past relevant work. Relying on this testimony, the ALJ found that Plaintiff can perform her past relevant work and that, therefore, she is not disabled. Tr. 17.

Because the court has found that the hypothetical posed to the VE was properly formulated, the VE's testimony constitutes substantial evidence supporting the ALJ's decision. See Robson, 526 F.3d at 392; Wingert, 894 F.2d at 298.

## IV.
## CONCLUSION

For the reasons more fully set forth above, the court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint be **DENIED** and that judgment should be entered in favor of Defendant. Doc. 1, Doc. 12.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

38

Dated this <u>30th</u> day of  March, 2010.